**Trevor MATTIS, Petitioner,**

v.

**Donald T. VAUGHN, et al., Defendants.**

**No. CIV. A. 99–6533.**

United States District Court,
E.D. Pennsylvania.

Jan. 17, 2001.

Norris E. Gelman, Philadelphia, PA for petitioner.

Thomas W. Dolgenos, Donna G. Zucker, and Robert M. Falin, District Attorney's Office, Philadelphia, PA for respondents.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. Facts and Procedural History

We have before us objections to the Report and Recommendation of a Magistrate Judge. To resolve this matter, we are called upon to review a new Order No. 218 of the Supreme Court of Pennsylvania. On December 22, 1999, petitioner Trevor Mattis, through counsel, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Mattis was convicted on July 20, 1990, in the Court of Common Pleas for Philadelphia, in a non-jury bench trial be-

fore Judge David N. Savitt, of first degree murder, criminal conspiracy, possession of an instrument of a crime, and a violation of the Uniform Firearms Act. (Information Nos. 2008, 2012, October Term, 1989.) Judge Savitt sentenced Mattis to life in prison for first degree murder and to concurrent terms of five to ten years for conspiracy, two and one-half to five years for possession of an instrument of a crime, and six to twelve months for the firearms violation.

At Mattis's bench trial, the Commonwealth proved the following facts. In September 1988, Franklin Watson, a/k/a Troop, flew from Ft. Lauderdale, Florida to Philadelphia, Pennsylvania at the request of petitioner Trevor Mattis, a/k/a Anton Ford,[1] a/k/a Too Strong, a/k/a Two Strand, to assist Mattis in selling drugs in Philadelphia. Mattis and a person known as "Mikey" or "Donovan" met Watson at the airport on September 13, 1988 and drove him to 7116 Louise Road in Philadelphia. Mattis, Donovan, and Watson arrived at that address at approximately 11:00 p.m. Four other persons were already present at that address: "Kurt," "Smackeroo," "Kid," and Elaine Jenkins. During the early morning hours of September 14, 1988, Mattis and Donovan left the house, and the decedent, Everton Mead Johnson, a/k/a "Meadie," decedent's brother, Paul White, and a third person, "Gary," arrived. At some time thereafter, Mattis and Donovan returned to the house, and an argument arose between them and Johnson as to who would sell drugs out of the house. A poor relationship already existed between Mattis and Johnson due to a prior disagreement. During the argument, Mattis drew a nine millimeter handgun and threatened Johnson. Mattis and Johnson then left the house. Johnson, who followed Mattis and Donovan out the

front door of the house, went to the rear of his car to retrieve some clothing from the trunk. Mattis, with Donovan nearby, grabbed Johnson and the two struggled. Mattis drew his gun again and shot Johnson seven times from behind at a distance of less than two feet, killing him. After the shooting, Watson did not report the crime to the police or come forward as a witness because he was afraid that his life would be in danger if he testified. (N.T., 7/19/90, at 70, 92–96, 99, 101–07, 157–59, 123–24; 7/20/90, at 304.)

Several days before Mattis's bench trial, the prosecutor handling the case, Assistant District Attorney ("ADA") Richard Sax, learned from a Philadelphia detective that Watson, who had returned to Florida, might have information regarding the case. Sax had Watson flown to Philadelphia and met with him the night before the trial. Watson testified at the bench trial that Mattis shot Johnson. There was, however, other evidence of Mattis's guilt, including eyewitness testimony by Paul White. Mattis was convicted by the judge at the bench trial.

After his conviction, Mattis learned of an inconsistent statement Watson had made during an interview by federal agents on June 25 and June 26, 1990, prior to Mattis's July bench trial.[2] The interview conducted by the federal authorities was unrelated to Mattis's homicide case; instead it was part of the investigation of a drug sales operation that implicated both Mattis and Watson, along with approximately forty other persons. Assistant United States Attorney ("AUSA") Thomas H. Suddath, Jr. conducted the interview along with Philadelphia police officer Allan Ventour, ATF Special Agent Thomas Stankiewicz, and INS Special Agent Matthew Czaplicki.[3] (N.T., 7/23/91, at 5.) According to

---

1. Mattis asserted at trial on cross examination that his birth name is Anton Ford, and that Trevor Mattis is an alias he was arrested under in 1987. (N.T., 7/20/90, at 414–15.)

2. Mattis learned of the statement during the course of discovery for a federal drug trial. (N.T., 7/12/91, at 11.)

3. Agent Stankiewicz was present only on June 25, and Officer Ventour was present only on June 26. (N.T., 7/23/91, at 5.)

a document known as a DEA–6, which was created from rough notes taken by Agent Czaplicki during the interview,[4] Watson claimed at that time that Donovan killed Johnson while Mattis stood by, and then the two fled together.[5] Paragraphs 25 and 26 of the DEA–6 described the events leading up to the shooting, and paragraph 27 described the shooting itself and identified Donovan as the shooter. At no time before or after the bench trial did the federal authorities send a copy of the notes or DEA–6 to the Philadelphia District Attorney's Office.

Represented by new counsel, Mattis filed post-sentence motions pursuant to Pa. R.Crim. P. 1410, now Rule 720, and Judge Savitt held evidentiary hearings. At a post-sentence evidentiary hearing, AUSA Suddath testified that he related by telephone the information that Watson had given to federal investigators to an ADA in the Philadelphia County District Attorney's Office shortly before Mattis's bench trial. (N.T., 7/23/91, at 9–10). AUSA Suddath could not recall, however, to which ADA he spoke or all of the details of the conversation. (N.T., 7/23/91, at 10, 16–17.) AUSA Thomas J. Eicher testified that after he learned of AUSA Suddath's interview of Watson, he spoke with ADA Sax, but the most that he would have told ADA Sax was that Watson was a potential witness. (N.T., 7/23/91, at 25.) ADA Sax testified that he did not know of the existence of Watson as a potential witness until a few days prior to the first day of Mattis's bench trial, and had not spoken to either AUSA Suddath or AUSA Eicher before trial. (N.T., 7/12/91, at 51, 55–56, 59–63.)

Judge Savitt denied the post-sentence motions and Mattis appealed to the Penn-sylvania Superior Court raising nine claims:

(1) trial counsel (Daniel Preminger, Esquire) was ineffective in failing to fully investigate information as to how, when, and where the Commonwealth located Watson;

(2) trial counsel was ineffective in failing to ask for a continuance prior to Watson's testimony to ask how Watson became available to the Commonwealth and whether the Office of the United States Attorney had any statements the defense could use on cross-examination;

(3) trial counsel was ineffective in failing to introduce character testimony;

(4) trial counsel was ineffective in failing to ascertain whether Paul White had incentive to testify, and why he was incarcerated;

(5) trial counsel was ineffective in failing to call as a witness the police officer who searched the decedent's car in an effort to obtain testimony to undermine the credibility of White;

(6) trial counsel erred in conducting the examination of Detective Floyd Gallo;

(7) the district attorney committed prosecutorial misconduct by (i) misleading the court as to the information he had about Watson, (ii) failing to turn over all relevant discovery information as to Watson, and (iii) permitting Watson to present perjured testimony;

(8) the Commonwealth committed prosecutorial misconduct by interfering with defense counsel's ability to interview Watson; and

---

4. Agent Czaplicki's notes were not a verbatim account of Watson's statement; rather they were a summary. (N.T., 7/23/91, at 8.) Agent Czaplicki produced a handwritten version of the DEA–6 on July 31, 1990, more than ten days after the conclusion of Mattis's trial. (*Id.* at 13.) The handwritten version was then sent to the typing pool for transcription, and, due to a backlog, was not finalized until after September 24, 1991. (*Id.* at 14.)

5. In his statement, Watson referred to Mattis as "Too Strong." There is no dispute that "Too Strong" is the petitioner.

(9) the Commonwealth suppressed exculpatory evidence relating to Watson and failed to correct false testimony rendered by Watson.

(Resp. Ex. B (Pet.'s Br. on Direct Appeal to Pa.Super. Ct.).) The Superior Court denied the appeal and affirmed the convictions in a memorandum opinion. *Commonwealth v. Mattis*, 423 Pa.Super. 636, 616 A.2d 717 (1992) (table). Unfortunately for Mattis this was not further appealed to the Pennsylvania Supreme Court.

Represented by present counsel, on December 22, 1996, Mattis filed a petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons.Stat. Ann. § 9541, et seq., raising the following three claims:

(1) appellate counsel (John Griffin, Esquire) was ineffective for failing to urge reversal at the post trial motions stage and on appeal based on the Commonwealth's *Brady* violation;

(2) the Watson statements made to federal officials prior to petitioner's trial comprise *Brady* material; and

(3) the instant *Brady* claim was not raised and was not previously litigated on direct appeal and if mentioned was presented as an improper prosecutor misconduct argument by ineffective appellate counsel and can be raised on this appeal.

(Resp. Ex. A (Pet.'s Br. on PCRA Appeal to Super. Ct.).) By an Order dated December 12, 1997, Judge Savitt dismissed the appeal, finding that Mattis had previously raised his PCRA claims on direct appeal. *Commonwealth v. Mattis*, No. 2008–2012, October Term, 1989 (Dec. 12, 1997). Mattis appealed the dismissal of the PCRA petition to the Superior Court, claiming that he had not previously litigated his PCRA *Brady* claims because trial counsel had failed to raise them properly. (Resp.Ex. B.) The Superior Court affirmed the trial judge's dismissal of the PCRA petition in a memorandum opinion. *Commonwealth v. Mattis*, 742 A.2d 207 (Pa.Su-per.1999). Mattis then filed a petition for allowance of an appeal to the Pennsylvania Supreme Court raising the same claims. The Pennsylvania Supreme Court denied review. *Commonwealth v. Mattis*, 560 Pa. 701, 743 A.2d 917 (1999) (table).

In his present federal petition for a writ of habeas corpus, Mattis raises the following three claims:

(1) appellate counsel, John Griffin, Esquire, was ineffective for failing to raise a *Brady* claim in post-trial motions and on direct appeal;

(2) the Pennsylvania courts did not provide a forum where the issues Mattis raised in his PCRA petition could receive a full and fair hearing; and

(3) in finding that Mattis's claims were previously litigated, the Superior Court effectively ruled on the antecedent claim that counsel was ineffective and found him not to have been ineffective; Mattis claims this ineffectiveness claim is a federal claim for this court to consider.

(Pet. at ¶ 12.) Mattis also filed two supplemental memoranda in support of his petition. (Docs. No. 12, 16.) In his second supplemental memorandum, Mattis amended his federal habeas petition to add a fourth substantive claim:

(4) the Commonwealth's *Brady* violations denied Mattis a fair trial.

(Pet.'s Second Supp. Mem. at 3.) Mattis further argues that he has shown a miscarriage of justice which excuses any claim of procedural default. (Pet. at 12.)

In keeping with court policy we initially referred this matter to a magistrate judge, by order of January 10, 2000. Before the Court is a Report and Recommendation by Magistrate Judge Thomas J. Rueter, filed on September 29, 2000, which finds that the Court may review the merits of Mattis's *Brady* claims and recommends that his federal habeas petition be granted, notwithstanding the fact that, as part of his direct appeal, Mattis never sought review

of his claims by the Pennsylvania Supreme Court. The District Attorney of Philadelphia County, on behalf of Respondents, filed objections on October 16, 2000, to the Magistrate Judge's recommendation and conclusions as to these issues. Respondents argue that the *Brady* claims are procedurally defaulted, because Mattis failed to present them to the Pennsylvania Supreme Court when he had the opportunity to do so as part of his initial appeal. Respondents argue further that this procedural default is not affected by a new May 9, 2000 order of the Pennsylvania Supreme Court purporting to deem all state remedies for a claim to be exhausted for purposes of federal habeas corpus relief if the claim has been presented to the Superior Court.[6] *See In re: Exhaustion of State Remedies in Criminal and Post–Conviction Relief Cases*, No. 218 Judicial Administration Docket No. 1 (Pa. May 9, 2000) (per curiam) (hereinafter "Order No. 218"). The Respondents argue next that even if Order No. 218 is valid, it cannot have retroactive effect and be applied to Petitioner. Even if Order No. 218 can be so applied, Respondents argue lastly that the Magistrate Judge erred in concluding that Mattis's petition based on a *Brady* violation should be granted. We will review de novo the Magistrate Judge's conclusions

and recommendations regarding the validity and retroactivity of Order No. 218 and the substance of Mattis's *Brady* claim. 28 U.S.C. § 636(b)(1).

▌ Magistrate Judge Rueter concluded, in agreement with the Pennsylvania courts' PCRA rulings, that Mattis presented his *Brady* claims on direct appeal. Therefore the Magistrate Judge concluded that Mattis's first, second, and third federal habeas claims must fail. As to the first, because appellate counsel raised the *Brady* claims on direct appeal, he cannot be found ineffective for failing to do so. Mattis's second and third claims are premised on the argument that the Pennsylvania courts erred in finding that the PCRA *Brady* claims were raised on direct appeal. Because the *Brady* claims were so raised,[7] these two claims are also meritless. Neither party has objected to these conclusions by the Magistrate Judge, and we find that the parties have waived any objection to these issues and conclusions. We therefore approve the findings and conclusions of the Magistrate Judge in that regard and we adopt them in full. We will therefore deny and dismiss Mattis's first, second, and third federal habeas claims.

6. The Order reads in full as follows:

AND NOW, this 9th day of May, 2000, we hereby recognize that the Superior Court of Pennsylvania reviews criminal as well as civil appeals. Further, review of a final order of the Superior Court is not a matter of right, but of sound judicial discretion, and an appeal to this Court will only be allowed when there are special and important reasons therefor. Pa.R.A.P. 1114. Further, we hereby recognize that criminal and post-conviction relief litigants have petitioned and do routinely petition this Court for allowance of appeal upon the Superior Court's denial of relief in order to exhaust all available state remedies for purposes of federal habeas corpus relief.

In recognition of the above, we hereby declare that in all appeals from criminal convictions or post-conviction relief matters, a litigant shall not be required to petition for rehearing or allowance of appeal following an adverse decision by the Superior Court in order to be deemed to have

exhausted all available state remedies respecting a claim of error. When a claim has been presented to the Superior Court, or to the Supreme Court of Pennsylvania, and relief has been denied in a final order, the litigant shall be deemed to have exhausted all available state remedies for purposes of federal habeas corpus relief. This Order shall be effective immediately. *In re: Exhaustion of State Remedies in Criminal and Post–Conviction Relief Cases*, No. 218 Judicial Administration Docket No. 1 (Pa. May 9, 2000) (*per curiam* ).

7. Mattis's counsel on direct appeal to the Superior Court raised the question: "Did the Commonwealth suppress exculpatory evidence relating to their chief witness, Mr. Franklin Watson ...." (Pet., Exh. E., at 4.) The five pages of the brief addressing that question extensively discussed and applied *Brady*. (Pet., Exh. E., at 39–44.)

## II. Exhaustion, Procedural Default, and Order No. 218

 Mattis filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), accordingly this Act applies to his case. *See Lindh v. Murphy,* 521 U.S. 320, 326–327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under the federal habeas corpus statute, as amended by AEDPA, we may not grant a state prisoner's petition for a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State" or "there is an absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(A) and (B)(i). *See also Rose v. Lundy,* 455 U.S. 509, 515, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) ("[S]tate remedies must be exhausted except in unusual circumstances"); *Coss v. Lackawanna County D.A.,* 204 F.3d 453, 460 (3d Cir. 2000) (*en banc*) (citing § 2254(b) and stating "absent a valid excuse, a habeas petitioner must present all federal claims to the state courts" before presenting them to the federal courts). The federal petition must be dismissed and any unexhausted claims first raised in state court unless it is clear that no colorable federal claim is presented by such unexhausted claims, in which case the petition may be denied on its merits, *see* 28 U.S.C. § 2254(b)(2); *Lambert v. Blackwell,* 134 F.3d 506, 515 (3d Cir.1997). Such a claim may be procedurally barred in state court, and if so, the claim is considered exhausted because state court review is no longer available. If state law clearly forecloses state court review of the claim, the claim is procedurally defaulted; this independent and adequate ground for judgment under state law, not lack of exhaustion, forecloses federal habeas review. *See Gray v. Netherland,* 518 U.S. 152, 161–62, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Banks v. Horn,* 126 F.3d 206, 211 (3d Cir.1997).

The habeas statute also provides that "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." § 2254(c). In *O'Sullivan v. Boerckel,* the Supreme Court noted that although the language of § 2254(c) "could be read to effectively foreclose habeas review by requiring a state prisoner to invoke any possible avenue of state court review, we have never interpreted the exhaustion requirement in such a restrictive fashion." 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). For example, the exhaustion doctrine does not require prisoners to file repetitive petitions, *id.* (citing *Brown v. Allen,* 344 U.S. 443, 447, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (holding that a prisoner need not seek state collateral relief "based on the same evidence and issues already decided by direct review")); *see also Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir.1997) (same); or "invoke extraordinary remedies when those remedies are alternatives to the standard review process and where the state courts have not provided relief through those remedies in the past," *O'Sullivan,* 526 U.S. at 844, 119 S.Ct. 1728 (citing *Wilwording v. Swenson,* 404 U.S. 249, 249–250, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (per curiam) (rejecting suggestion that alternatives to state habeas such as "a suit for injunction, a writ of prohibition, or mandamus or a declaratory judgment in the state courts" must be sought)).

 The *O'Sullivan* Court explained further that § 2254(c) "requires only that state prisoners give state courts a fair opportunity to act on their claims." *Id.* (citing *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989); *Picard v. Connor,* 404 U.S. 270, 275–276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). The petitioner must fairly present to the state courts all the claims made in his habeas corpus petition. *See Lines v. Larkins,* 208 F.3d 153, 159 (3d Cir.2000); *Henderson v. Frank,* 155 F.3d 159, 164 (3d Cir.1998). To satisfy the "fair presentation" requirement, the state court plead-

ings must demonstrate that the legal theory and supporting facts asserted in the federal habeas petition are "substantially equivalent" to those presented to the state courts, *see Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996), and the method of legal analysis to be applied in federal court was available to the state courts, *see McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir.1999).

■ The exhaustion requirement is a rule of comity, not jurisdiction, *see Castille v. Peoples*, 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and is designed to allow state courts the opportunity to correct a state's alleged violation of federal constitutional law before federal courts consider the matter, *O'Sullivan*, 526 U.S. at 844–45, 119 S.Ct. 1728 (citations omitted). Comity requires state prisoners to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845, 119 S.Ct. 1728.

In *O'Sullivan*, the Court considered whether a state prisoner must submit his claims to a state's highest court for review, when such review is discretionary rather than mandatory, in order to satisfy the exhaustion requirement. The Court held that a petition for discretionary review by a state's highest court "is a normal, simple, and established part of the State's appellate review process" and is not "extraordinary" like the procedures the Court found unnecessary in *Brown v. Allen* and *Wilwording v. Swenson*. *Id.* Section 2254(c) does not require a right to review by a state's highest court, but requires only the right to raise claims through a petition for discretionary review by such a court. *Id.* The Court explained that a system of discretionary review, by itself, does not make

such review "unavailable" for purposes of § 2254. *Id.* at 846, 119 S.Ct. 1728.

The Court emphasized that its rule "requiring state prisoners to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State," *id.* at 847, 119 S.Ct. 1728, "serves the comity interests that drive the exhaustion doctrine," *id.* at 846, 119 S.Ct. 1728. Nevertheless, the Court acknowledged in dicta that the rule "has the potential to increase the number of filings in state supreme courts [and] that this increased burden may be unwelcome in some state courts because the courts do not wish to have the opportunity to review constitutional claims before those claims are presented to a federal habeas court." *Id.* at 847, 119 S.Ct. 1728 (citing *In re Exhaustion of State Remedies in Criminal and Post–Conviction Relief Cases*, 321 S.C. 563, 471 S.E.2d 454 (1990); *Arizona v. Sandon*, 161 Ariz. 157, 777 P.2d 220 (1989) (both indicating that state prisoners need not petition for review by the state's highest court for their state remedies to be deemed exhausted for the purpose of federal habeas)). The Court further acknowledged that where there is such a statement by a state's highest court, "the increased, unwelcome burden on state supreme courts [may] disserve[ ] the comity interests underlying the exhaustion doctrine." *Id.*

The issue of whether such a statement by a state's highest court would make discretionary review "unavailable" within the meaning of the statute, outside "the ordinary appellate review procedure in the State," or not within "one complete round of the State's established appellate review process" was not before the Court in *O'Sullivan*. The Court simply did not address the effect such a statement would have on its exhaustion analysis.[8] The

---

8. This point was emphasized in the concurring and dissenting opinions. *See O'Sullivan*, 526 U.S. at 849, 119 S.Ct. 1728 (Souter, J., concurring) ("I understand the Court to have left open the question (not directly implicated by this case) whether we should construe the

exhaustion doctrine to force a State, in effect, to rule on discretionary review applications when the State has made it plain that it does not wish to require such applications before its petitioners may seek federal habeas relief."); *id.* at 861, 119 S.Ct. 1728 (Stevens, J.,

Court merely emphasized again that exhaustion turns on an inquiry into which procedures are "available" and noted in dicta that nothing in its decision "requires the exhaustion of any specific state remedy when a State has provided that that remedy is unavailable." *Id.* Section 2254(c) "directs federal courts to consider whether a habeas petitioner has 'the right *under the law of the State to raise, by any available procedure,* the question presented.'" *Id.* (emphasis added by the Court). The Court explained further that "there is nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is not available. We hold today only that the creation of a discretionary review system does not, *without more,* make review in the Illinois Supreme Court unavailable." *Id.* at 847–48, 119 S.Ct. 1728 (emphasis added).

It appears that Justice Souter, concurring, and the three dissenting Justices in *O'Sullivan* would honor the wishes of state Supreme Courts, such as Arizona, South Carolina, and now Pennsylvania, that have attempted to place their discretionary dockets outside of the standard review process of criminal appeals and post-conviction review procedures or have otherwise explicitly indicated that they wish these claims to be treated as exhausted for purposes of federal habeas. If there is such a rule or statement, i.e. if the state "has plainly said that [discretionary review] need not be sought for the purpose of exhaustion," and is "outside the standard review process," neither comity nor precedent requires that discretionary review be sought. *O'Sullivan* at 849–50, 119 S.Ct. 1728 (Souter, J., concurring). It appears that in such a case, Justice Souter would allow a prisoner to decline to seek discretionary review, "even when a state

court has occasionally employed [discretionary review] to provide relief," just as prisoners may forego seeking the extraordinary remedies discussed in *Wilwording v. Swenson,* 404 U.S. 249, 249–50, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971). Justice Souter also explained his understanding of the majority's brief mention of such statements in its discussion of state laws or rules making procedures "unavailable":

> [The Court's] citation of *In re Exhaustion of State Remedies,* for the proposition that the increased burden on state courts may be unwelcome, should not be read to suggest something more: that however plainly a State may speak its highest court must be subjected to constant applications for a form of discretionary review that the State wishes to reserve for truly extraordinary cases, or else be forced to eliminate that kind of discretionary review.

*O'Sullivan* at 849–50, 119 S.Ct. 1728 (Souter, J., concurring).

Justice Stevens (joined by Justice Ginsburg and Justice Breyer) would be guided by comity rather than consider discretionary review "unavailable" or outside the standard review process. *O'Sullivan* at 859–62, 119 S.Ct. 1728 (Stevens, J., dissenting). After explaining that the real issue in *O'Sullivan* is not exhaustion, but procedural default, he stated that "federal courts should not find procedural default when a prisoner has relied on a state supreme court's explicit statement that criminal defendants need not present to it every claim that they might wish to assert as a ground for relief in federal habeas proceedings." *Id.* at 862, 119 S.Ct. 1728. Justice Breyer (joined by Justice Ginsburg and Justice Stevens) also emphasized comity in making the point that "[i]f the State does not want the prisoner to seek discre-

dissenting) ("Thankfully, the Court leaves open the possibility that state supreme courts with discretionary dockets may avoid a deluge of undesirable claims by making a plain statement-as Arizona and South Carolina have done—that they do not wish the opportunity

to review such claims before they pass into the federal system.") (citations omitted); *id.* at 864, 119 S.Ct. 1728 (Breyer, J., dissenting) ("I write to emphasize the fact that the majority has left the matter open.").

tionary state review (or if it does not care)," the failure should not matter to federal habeas law. *O'Sullivan* at 862, 119 S.Ct. 1728 (Breyer, J., dissenting).

There is an initial problem that must be resolved before we move on. We respectfully believe that Pennsylvania Supreme Court's Order No. 218 may not do what it purports to do on its face, i.e. expressly direct federal courts to "deem claims exhausted" if such claims have been raised to the Superior Court and a final judgment has been entered. The Supremacy Clause of the United States Constitution would appear to prevent such a directive, because it is the federal courts, not the state courts, that must determine whether "available" remedies have been "exhausted" in the state courts before the federal courts can hear the claims. *See* U.S. Const. art. VI; 28 U.S.C. § 2254. The Order can be valid, however, if we read it only as a declaration by the Pennsylvania Supreme Court that discretionary review is "unavailable" or "not within a full round of its ordinary review process" as Arizona and South Carolina have done. We hold therefore that Order No. 218 of the Pennsylvania Supreme Court has made such review "unavailable" in Pennsylvania.

We are aware of the Supreme Court's pronouncement in *O'Sullivan* that the existence of a discretionary review system by itself does not make such review "unavailable" within the meaning of the statute. In *O'Sullivan*, the United States Supreme Court stated that it "hold[s] today only that the creation of a discretionary review system does not, *without more*, make review in the Illinois Supreme Court unavailable." *O'Sullivan* at 848, 119 S.Ct. 1728 (emphasis added). The Court did not indicate what the something "more" might be, nor did it decide the effect a statement such as Order No. 218 would have on its analysis. We believe that statements such as Pennsylvania's Order No. 218 suffice as the something "more" required to render discretionary review "unavailable" within the meaning of § 2254 and *O'Sullivan*.

Our decision is guided by the emphasis of the Supreme Court majority on comity as the basis for the exhaustion doctrine, as well as the emphasis on comity in the concurring and dissenting opinions. We agree also with the concurring and dissenting Justices in *O'Sullivan* that the interests of comity would be greatly disserved by ignoring the pronouncements of state supreme courts that they see no need for prisoners to petition them for discretionary review before the prisoners can seek federal habeas corpus relief. Most systems of discretionary review, in setting forth the standards for such review, show the state's unwillingness to have all possible claims brought to them before a prisoner may seek federal review, instead indicating that state appellate courts will grant review only in unusual circumstances, or for important and special reasons, or for issues of broad significance. *See O'Sullivan*, 526 U.S. at 862–63, 119 S.Ct. 1728 (Breyer, J., dissenting) (citations omitted). Statements such as those made by the Arizona, South Carolina, and Pennsylvania Supreme Courts make such unwillingness crystal clear. From the beginning, the purpose of the exhaustion doctrine has been to demonstrate respect for the state courts. Disregarding a state supreme court's explicit attempt to control its docket and to decline the comity extended to it by the federal court goes against the very purpose of the exhaustion doctrine and obliterates the concept of comity.

Other courts have also interpreted the majority opinion of *O'Sullivan*, along with the concurring opinion of Justice Souter, as allowing states to deem discretionary review unavailable through an explicit statement of the state's supreme court. In *Swoopes v. Sublett*, the Ninth Circuit applied Justice Souter's analysis, deciding that "Arizona has identified discretionary Supreme Court review 'as outside the standard review process and has plainly said that it need not be sought for the purpose of exhaustion,'" 196 F.3d 1008, 1010 (9th Cir.1999) (quoting *O'Sullivan* at

850, 119 S.Ct. 1728 (Souter, J., concurring)), *cert. denied,* —— U.S. ——, 120 S.Ct. 1996, 146 L.Ed.2d 820 (2000). The Ninth Circuit stated that " '[o]nce the defendant has been given the appeal to which he has a right, state remedies have been exhausted,' " *id.* (quoting *Arizona v. Sandon,* 161 Ariz. 157, 777 P.2d 220, 221 (1989) (citations omitted)). Although the Ninth Circuit acknowledged the majority's plain statement regarding the meaning of unavailable: "the Court was clear that 'the creation of a discretionary review system does not, without more, make review' in a state supreme court 'unavailable,' " *id.* at 1009 (quoting *O'Sullivan,* 526 U.S. at 849, 119 S.Ct. 1728), it relied on Justice Souter's construction of this statement "to mean a discretionary procedure that a 'state court has occasionally employed to provide relief, so long as the state has identified the procedure as outside the standard review process and has plainly said that it need not be sought for the purpose of exhaustion.' " *Id.* at 1009–1010. (citing *O'Sullivan,* 526 U.S. at 850, 119 S.Ct. 1728 (Souter, J. concurring)). The Ninth Circuit concluded that "post-conviction review before the Arizona Supreme Court is a remedy that is 'unavailable' within the meaning of *O'Sullivan,*" *id.* at 1010, and that "Arizona has declared that its 'complete round' [of the State's established appellate review process] does not include discretionary review before the Arizona Supreme Court," *id.* (quoting *O'Sullivan,* 526 U.S. at 845, 119 S.Ct. 1728).[9] The Ninth Circuit also relied on principles of federalism in "credit[ing] Arizona's choice," recognizing that "each state

is entitled to formulate its own system of post-conviction relief, and ought to be able to administer that system free of federal interference." *Id.* (quoting *Nino v. Galaza,* 183 F.3d 1003, 1007 (9th Cir.1999)). The Ninth Circuit held that "except in habeas petitions in life-sentence or capital cases,[10] claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them." *Id.*

Another District Court recently held that Order No. 218 validly limited the availability of discretionary review by the Pennsylvania Supreme Court. *Blasi v. Attorney General,* 120 F.Supp.2d 451 (M.D.Pa.2000). The court in *Blasi* interpreted the *O'Sullivan* majority's dicta regarding a state's making discretionary review unavailable and citation to the South Carolina and Arizona cases as being "strongly suggestive that this means of waiving the exhaustion requirement would be upheld by the Supreme Court of the United States, and those Justices who concurred and dissented in *O'Sullivan* would so hold." *Id.* at 466. The court in *Blasi* questioned the propriety of treating Order No. 218 as an actual waiver of the exhaustion requirement by the Commonwealth, because 28 U.S.C. § 2254(b)(3) appears to vest the power to waive the requirement in the executive branch of the states. *Id.* at 469. The court in *Blasi* also pointed to the Ninth Circuit's opinion in *Swoopes* as embodying the principle of deference to Supreme Court dicta, and it followed the Ninth Circuit's reasoning that statements such as Arizona's in *Sandon* and Pennsylvania's in Order No. 218 remove petitions

9. The Ninth Circuit later stated that the "primary thrust of *O'Sullivan* " is that "the exhaustion doctrine is a matter of federal law and that a state prisoner was required to seek discretionary review before the [state supreme court] to exhaust state remedies." *Id.* at 1010–1011. The Ninth Circuit then asserts that *"O'Sullivan* recast the manner by which we must ascertain whether state appellate procedures are 'available' for exhaustion purposes. The import of *O'Sullivan* is that exhaustion is not required when a state declares

which remedies are 'available' for exhaustion. Arizona has done so." *Id.* at 1011.

10. Arizona provides that capital cases are automatically appealed directly to the Supreme Court of Arizona, bypassing the Court of Appeals, which has no jurisdiction over such cases. *See* Ariz.Rev.Stat. §§ 12–120.21(A)(1); 12–120.24; 13–4031; Ariz. R.Crim. P. 31. Prior to 1989, cases in which a life sentence was imposed were treated similarly. *See* Ariz. Laws 1989, Ch. 58, §§ 1, 2.

for discretionary review "from one complete round of [a state's] established appellate review process." *Id.*

We likewise conclude that principles of deference to Supreme Court dicta and of comity towards the state courts, which is the basis of the exhaustion doctrine, require us to respect the pronouncement of the Pennsylvania Supreme Court in Order No. 218. We therefore conclude and hold that Order No. 218 removes a petition for discretionary review from one full round of Pennsylvania's ordinary review process and therefore makes discretionary review unavailable for the purpose of the exhaustion requirement in § 2254.

## III. Retroactivity of Order No. 218

Even though we acknowledge the validity of Order No. 218 in making discretionary review "unavailable" or "not within the ordinary review process" in Pennsylvania, we are still left with the question of whether the Order should apply retroactively.[11] The retroactivity issue is intertwined with the validity issue, and therefore our interpretation of Order No. 218 with respect to retroactivity must comport with our interpretation of the Order with respect to validity. As we discussed previously, although the Order directs that "the litigant shall be deemed to have exhausted all available state remedies for purposes of federal habeas corpus relief," we have interpreted the Order not as a directive to federal courts to deem exhausted certain claims, but rather as a declaration that a petition for rehearing or allowance of appeal to the Supreme Court is not required because such review is "unavailable" or "not within the ordinary review process."

The Pennsylvania Supreme Court declared that the "Order shall be effective immediately." This statement could have at least two meanings. First, it might mean that effective immediately, prisoners

should consider discretionary review to be unavailable to them or at least outside the standard review process, and therefore they need no longer seek such review before filing their federal habeas petitions. It also might mean that effective immediately, federal courts should consider discretionary review to be unavailable or at least outside the standard review process, and therefore on the effective date of the rule, federal courts should deem exhausted any pending claims before them on federal habeas petitions that were raised at least before the Pennsylvania Superior Court, even if the claims were never raised before the Pennsylvania Supreme Court and could not be raised there now. The latter interpretation of the Order would make the declaration of unavailability retroactive, saying that even though Third Circuit and Supreme Court precedent make seeking discretionary review mandatory for exhaustion in the absence of such an order or rule, *see O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Evans v. Court of Common Pleas,* 959 F.2d 1227, 1230 (3d Cir.1992); *Caswell v. Ryan,* 953 F.2d 853, 861 (3d Cir.1992); *Beaty v. Patton,* 700 F.2d 110, 111 (3d Cir.1983); we are now to treat such review as not having been available in the past. We respectfully believe the latter interpretation has the same problem that the interpretation of the Order as a directive to the federal courts to deem claims exhausted had: it would be a Supremacy Clause violation. Instead of ascribing an unconstitutional meaning to the Order, i.e. an attempt by the Pennsylvania Supreme Court to direct the federal courts to treat the Pennsylvania system as never having required petitions to the Pennsylvania Supreme Court for discretionary review, we opt to interpret the Order merely as an attempt to state that, effective immediately, the ordinary appeals process in Penn-

---

11. The retroactivity of such a statement was not at issue in *Swoopes,* because the Arizona Supreme Court decided *Sandon* long before Swoopes declined to petition that court for review. The court in *Blasi* failed to explicitly address the retroactivity issue, deciding sub silentio that the Order applied retroactively.

sylvania shall no longer include petitions for discretionary review.[12] Such a declaration of the content of the ordinary review process is directed at prisoners and does not raise Supremacy Clause concerns. We therefore believe that Order No. 218 should not be applied retroactively. Even if the Supremacy Clause were not a concern, however, there are several other reasons for our conclusion that the Order should not be applied retroactively.

Neither the purpose of Order No. 218 nor our primary reason for holding that it is valid supports its retroactive application. The purpose of the Order is to discourage petitions for discretionary review that present no "special or important" issues and whose only likely purpose is "to exhaust all available state remedies for purposes of federal habeas corpus relief." Order No. 218. The Order does not appear to be designed to benefit state prisoners seeking to litigate claims that were previously procedurally defaulted in federal court. We are upholding Order No. 218 on the basis of comity—respecting the Pennsylvania Supreme Court's attempt to control its docket. This purpose is not served by applying the Order retroactively—any docket relief for the Pennsylvania Supreme Court could be prospective only. Making the Order retroactive would instead greatly increase the burden[13] on the federal courts without providing any additional relief to the Pennsylvania Supreme Court.

Further, the dissenting Justices in *O'Sullivan,* who would respect statements from state supreme courts such as those by Pennsylvania, South Carolina, and Arizona, would do·so not only because of

concerns for comity, but also because of the injustice that would result from a prisoner's reliance on such a statement and a federal court's subsequent refusal to respect such a statement. *See O'Sullivan,* 526 U.S. at 862, 119 S.Ct. 1728 (Stevens, J., dissenting) ("The key point is that federal courts should not find procedural default when a prisoner has relied on a state supreme court's explicit statement that criminal defendants need not present to it every claim that they might wish to assert as a ground for relief in federal habeas proceedings."). Prisoners to whom such a statement is retroactively applied, however, could not have relied on a statement that was not yet in existence; therefore the reliance interest served by respecting such a statement does not support its retroactive application.

We believe the plain language of Order No. 218, specifically that "a litigant shall not be required to petition for rehearing or allowance of appeal" and the "Order shall be effective immediately," indicates that the Pennsylvania Supreme Court did not intend the Order to apply retroactively. The Pennsylvania Supreme Court could have used express language of retroactivity if it had intended the Order to apply retroactively. It is true that the Pennsylvania Supreme Court has held that "where an appellate decision overrules prior law and announces a new principle, unless the decision specifically declares the ruling to be prospective only, the new rule is to be applied retroactively to cases where the issue in question is properly preserved at all stages of adjudication up to and including any direct appeal." *Commonwealth v. Cabeza,* 503 Pa. 228, 469 A.2d 146, 148

---

12. Because the Order must be interpreted as a change in procedural rules by the Pennsylvania Supreme Court, not as an attempt by it to change federal law, cases regarding the retroactivity of new federal rules, such as *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), which required the application of newly declared constitutional rules to criminal cases pending on direct review, and *Harper v. Virginia Department of Taxation,* 509 U.S. 86, 113 S.Ct. 2510,

125 L.Ed.2d 74 (1993), which requires that rules of federal law applied by the Supreme Court to the parties before it must also be applied to all cases still open on direct review, are inapposite.

13. Without a doubt many claims have been denied by the federal courts over the years because they were procedurally defaulted.

(1983). Obviously, however, any federal habeas corpus case in which a petitioner has foregone seeking discretionary review by the Pennsylvania Supreme Court and now seeks the retroactive application of Order No. 218 logically could not have anticipated and preserved the issue of whether discretionary review must be sought, and is well beyond "all stages of adjudication up to and including any direct appeal." Further, the Pennsylvania Supreme Court qualified the *Cabeza* rule on retroactivity when a state habeas petitioner sought the retroactive application of a case: "Simply stated, a new rule of law to which we give full retroactive effect will not be applied to any case on collateral review unless that decision was handed down during the pendency of an appellant's direct appeal." *Commonwealth v. Gillespie*, 512 Pa. 349, 516 A.2d 1180, 1183 (1986). Considering the Pennsylvania Supreme Court's refusal to apply new case law retroactively in a PCRA action when the court did not declare that the new case should be retroactively applied, we believe it is unlikely that the Pennsylvania Supreme Court intended Order No. 218 to apply retroactively in the absence of an express declaration to that effect.

Construing Order No. 218 instead as a procedural rule, or an amendment of a procedural rule, would not lead to our applying it retroactively. Rule 52(a) of Pennsylvania's Rules of Civil Procedure provides that "[a] rule or an amendment to a rule shall be effective upon the date specified by the Supreme Court," and Pa. R.C.P. 52(c) further provides that "[u]nless the Supreme Court specifies otherwise, a rule or an amendment to a rule shall apply to actions pending on the effective date." This rule applies only to Pennsylvania courts, however, and Mattis's action is not

pending in the Pennsylvania judicial system, but rather in the federal system.[14] Similarly, the rule that "legislation concerning purely procedural matters will be applied not only to litigation commenced after its passage, but also to litigation existing at the time of passage," *Morabito's Auto Sales v. Commonwealth*, 552 Pa. 291, 715 A.2d 384, 386 (1998), cannot be applied to Order No. 218, even by analogy. The Order is clearly not legislation and even if it were, state procedural legislation only applies in the state courts, not in the federal courts. For the foregoing reasons, we believe Order No. 218 should not be applied retroactively.

## IV. The *Brady* Claim

 Mattis has therefore not exhausted his *Brady* claim. Further, because petitions for allowance of appeal to the Pennsylvania Supreme Court must be filed within thirty days after the entry of a final order of the Superior Court, Mattis's *Brady* claim would now be procedurally barred. *See* Pa. R.A.P. 1113. We therefore conclude and hold that Mattis's *Brady* claim is procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (procedural default occurs when "the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred"); *see also O'Sullivan*, 526 U.S. at 848, 119 S.Ct. 1728.

 Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner establishes "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the default. *See Coleman v. Thompson*, 501 U.S.

---

**14.** We acknowledge that the Pennsylvania Supreme Court has a great deal of power in prescribing rules of procedure, *see* Pa. Const. Art. V § 10, even to the extent of suspending procedural legislation inconsistent with court-issued rules, *see id.* (c). It is not clear whether Pa. R.C.P. 52(c) would apply only to rules promulgated pursuant to the procedures in Pa. R.J.A. 103, or also to such orders of the Pennsylvania Supreme Court as Order No. 218. Even if R. 52(c) applied to such orders, it would not apply in the instant case, as we have already mentioned.

at 731, 111 S.Ct. 2546; *Lines v. Larkins*, 208 F.3d at 160; *Werts v. Vaughn*, 228 F.3d 178, 192 (3rd Cir.2000). Mattis has not even alleged cause for his default, much less proven it, and therefore we need not consider whether there would be prejudice if we did not consider the claim. Mattis does allege, however, that failure to consider his claim would result in a fundamental miscarriage of justice. The miscarriage of justice exception is quite narrow; it is available only in "extraordinary case[s], where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). To demonstrate that he is actually innocent, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him ... in light of all the evidence." *Schlup v. Delo*, 513 U.S. 298, 327–28, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). This showing requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324, 115 S.Ct. 851.

Although we believe that Mattis's *Brady* claim is procedurally defaulted, we must consider the claim to determine whether the fundamental miscarriage of justice exception applies. Further, in an abundance of caution we will review the *Brady* claim on the merits. In doing so, we find that there was no *Brady* violation, so there is no constitutional violation that can be the basis for the miscarriage of justice exception. Because there was no *Brady* violation, even if the claim were not procedurally defaulted, we would deny the application for the writ on its merits.

## A. Federal Habeas Corpus Law

A federal court may only grant a writ of habeas corpus filed by a state prisoner if a state court decision "(1) resulted in a decision that was contrary to, or involved the unreasonable application of, clearly estab-

lished federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214. The Supreme Court has clarified when a court may grant the writ under § 2254(d)(1):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).

■ The Supreme Court stated that with respect to the first prong of § 2254(d)(1), the "contrary to" clause, "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Id.* at 1519. The petitioner must show that "Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir.2000) (quoting *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 891 (3d Cir.) (en banc), *cert. denied*, 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999)).

■ With respect to the "unreasonable application" clause, the federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable."

*Williams v. Taylor*, 120 S.Ct. at 1521. The court "may not issue the writ simply because [the] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 1522.

The habeas corpus statute also provides that a state-court determination of a factual issue "shall be presumed to be correct" and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B. The *Brady* Standard

 Prosecutors have an affirmative duty to disclose evidence favorable to defendants, a duty which is most prominently associated with the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court has extended *Brady*, holding that the duty to disclose exists even if there has been no request by the accused, *see United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty includes both impeachment and exculpatory evidence, *see United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In *Bagley*, the Supreme Court held that regardless of whether evidence is requested, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. 3375; *see also Strick-*

*ler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The "reasonable probability" standard does not ask " 'whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Strickler*, 527 U.S. at 289, 119 S.Ct. 1936 (quoting *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555). Therefore a "reasonable probability" of a different result is "shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375).

 In *Kyles*, the Supreme Court further emphasized that "undermining confidence," not "sufficiency of the evidence," is the touchstone of the materiality inquiry. 514 U.S. at 434, 115 S.Ct. 1555. A defendant is not required to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434–35, 115 S.Ct. 1555. One shows a *Brady* violation by demonstrating that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. 1555.

The Court summed up the basic *Brady* components in *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999): "The evidence must be favorable to the accused, either because it is exculpatory, or it is impeaching; that evidence must have been suppressed by the State, either willfully, or inadvertently; and prejudice must have ensued."

## C. Mattis's *Brady* Claim

 Mattis claims that Watson made a statement in his interview by federal authorities that was inconsistent with his testimony at Mattis's trial; the statement could be used both to impeach Watson's testimony and to exculpate Mattis;

and federal authorities related this information to the District Attorney's office before Mattis's prosecution. Rough notes taken by a federal agent during Watson's interview indicated that Watson named Donovan as the shooter, not Mattis, but these notes were not given to the prosecutor before trial. The notes were typed into a written document, "DEA–6," more than a month after Mattis's bench trial, so the DEA–6 could not have been given to the District Attorney's office, either. Mattis alleges, however, that AUSA Suddath or AUSA Eicher orally related the exculpatory and impeaching information to ADA Sax or another ADA prior to his trial, and that the failure of the prosecution to give this information to his trial attorney was a *Brady* violation.[15]

 Judge Savitt concluded, during hearings on post-sentence motions, that neither ADA Sax nor any other ADA was aware of Watson's June 1990 statement that Donovan, not Mattis, shot Mead Johnson.[16] Judge Savitt's determination of this factual issue is presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Although the petitioner points to some testimony that supports his position that

AUSA Suddath informed an ADA of the exculpatory information, such testimony is taken out of context. A close examination of the full record confirms Judge Savitt's conclusion.

After AUSA Suddath interviewed Watson he attempted to contact the prosecutor for Mattis's murder trial. (N.T., 7/23/91, at 16.) Because he had checked Mattis's criminal history as part of his drug trafficking investigation, he knew that Mattis would soon stand trial for the murder of Mead Johnson, and he thought that the prosecution would want Watson as a witness. (*Id.* at 15.) AUSA Suddath spoke to an ADA by telephone, possibly ADA Sax, "a matter of days" before the trial, but he was not sure of the identity of the person with whom he spoke. (*Id.* at 9, 12, 15–17.) AUSA Suddath testified that he related the information Watson had provided to the ADA, but he could not remember the details of the conversation. He remembered trying to "piece together" his notes during the telephone call. Because he believed that his notes were "compatible" with the information provided in the later-transcribed DEA–6, he deduced that the information he related to the District Attorney's Office was "generally" consistent with the information contained in the DEA–6. (*Id.* at 10.)

15. It is undisputed that the alleged possession of this information by Philadelphia police officer Allan Ventour could not provide the basis for a *Brady* claim. Although the knowledge of a police officer investigating a crime is imputed to the prosecutor of the person accused of that crime, such an imputation is unwarranted in this case because Officer Ventour was not "acting on the government's behalf in the case" of the murder of Mead Johnson. *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Instead, Officer Ventour was assigned to the violent traffickers project, a multi-organization drug task force. (N.T., 7/23/91, at 21–22.) The trial judge asked specifically whether Officer Ventour was "representing the District Attorney's office or any prosecutorial or investigative authority that would deal with a homicide matter in the City of Philadelphia," and AUSA Suddath confirmed that Officer Ventour was not present in such a capacity. (*Id.*)

16. It is undisputed that the knowledge of one member of the prosecutor's office will be imputed to the whole office. In *Giglio v. United States*, the Supreme Court decided this issue with respect to the U.S. Attorney's office:

> The prosecutor's office is an entity and as such it is the spokesman for the Government.... To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.

405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The prosecution is " 'obligated to produce certain evidence actually or constructively in its possession or accessible to it.' " *Hollman v. Wilson*, 158 F.3d 177, 180 (3d Cir.1998) (quoting *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir.1991)).

Judge Savitt probed for specifics, indicating that the issue was when the Commonwealth obtained the information contained in paragraphs 26 and 27 of the DEA–6.[17] (*Id.* at 14.) The judge asked Suddath whether he had related the substance of paragraphs 26 and 27 in his telephone conversation with the unidentified ADA. (*Id.* at 15.) AUSA Suddath stated:

> Your Honor, to the best of my recollection, the information which I provided to the Assistant District Attorney generally followed the form set forth in paragraphs—the information contained in paragraphs 25 and 26. It was not as detailed as that.

(*Id.* at 15.) AUSA Suddath did not, however, testify that he related the substance of paragraph 27, which is the one that contains the actual details of the shooting and names Donovan as the shooter.

█ On cross examination by ADA Sax, AUSA Suddath confirmed that he told an ADA that he had a witness to the Johnson shooting who identified *Mattis* as the shooter.

Q. In essence, and please correct me if I'm wrong, your testimony is that you had a conversation with an assistant DA, possibly myself, sometime very shortly before the trial, and you said, in essence, there's a witness who says he saw the murder and he says that Two Strand did it, and he has an indictment pending and is coming up to deal with that matter from Florida to Philadelphia. Is that, in essence, what happened?

A. That's correct.

(*Id.* at 20–21, 616 A.2d 717.) AUSA Suddath also confirmed that, to the best of his recollection, and contemporaneously with his conversation with an ADA, there were no "written documents, reports, statements, [or] summaries of statements" provided to an ADA.[18] (*Id.* at 18, 616 A.2d

17. The portions of the DEA–6 regarding the Johnson murder state as follows:

> 25. He said that, in the house, were TOO STRONG, Paul WHITE, GARY, KIRK, SMACK–A–ROO, BILLY THE KID, and some girl who was RUDY's girlfriend. He said that RUDY supposedly owned the house. He said that, that night, MEADIE came over and that he and TOO STRONG got into an argument about MEADIE being in the house. In the living room, TOO STRONG was telling MEADIE that he was not supposed to be in the house but that MEADIE was telling TOO STRONG that he was going to wait until RUDY told him to leave. He said that one of TOO STRONG's people arrived, a guy named DONOVAN, slim, dark complexion, a Jamaican, approximately 5′ 10 to 11″ tall, 165 pounds, and wearing short hair. WATSON said that this was the first time that he ever saw this person.
> 26. WATSON stated that DONOVAN asked what was going on and MEADIE said something to the effect, "Who you pussy?" With that, DONOVAN pulled a gun and KIRK stopped him. He said that TOO STRONG told DONOVAN that they would wait until RUDY arrived. He said that TOO STRONG, DONOVAN, and MEADIE walked out of the house and down to the street. WATSON stated that Paul WHITE, GARY, and himself were at the front door about to go down the steps also.
> 27. WATSON stated that, while at the front door of the house, he saw MEADIE getting a change of clothing from the trunk of the car and that DONOVAN began beating him. He said that they scuffled and that he saw DONOVAN hold MEADIE against the car and shoot him with a chrome 9mm. He said that TOO STRONG was standing there next to the scuffle and he (WATSON) heard four (4) more shots. He said that TOO STRONG and DONOVAN ran to a car and drove off. He said that Paul WHITE got into a car and drove to the police station. WATSON said that everybody, except the girl, took off.

18. Much has been made of the fact that there was no written statement available at the time of trial, and of the possible implications of that fact on the *Brady* claim. While we agree with Magistrate Judge Rueter that *Brady* applies equally to information that the prosecutor received orally and in written form, we do not think that a distinction was made in the state courts. It is true that the trial judge's written opinion denying the post-trial motions did mention that the prosecutor had no writ-

717.) AUSA Eicher also testified that they do not disclose "handwritten notes of DEA–6s," or their own notes, or even the existence of such items. (*Id.* at 29, 616 A.2d 717.)

AUSA Eicher testified that he did not inform anyone in the District Attorney's office that Watson had allegedly named Mattis as the shooter in the Johnson murder, and indeed could not even recall whether he had spoken to anyone in the District Attorney's office about the case prior to the Mattis trial. Upon being asked whether he, or anyone at his direction, had any contact with the Philadelphia District Attorney's Office regarding the Johnson murder, he testified "I'm not really sure of the answer to that. I may have or I may have directed somebody. Let me say this. I don't recall having done it." (N.T., 7/23/91, at 25.) He testified that he did speak to ADA Sax at some point, because he remembered wondering whether the spelling was S–A–C–K–S or S–A–C–H–S, and a few days before the hearing in which he testified he learned that it was neither. (*Id.*) AUSA Eicher could not remember what they spoke about, but because he could not recall having spoken with ADA Sax about anything else, he deduced that the topic of conversation must have been the Johnson shooting. (*Id.* at 26–27.)

AUSA Eicher testified that if indeed he had spoken to ADA Sax, he would not have related any details about what Watson had said, only that he was a potential witness (*Id.* at 25–26.) AUSA Eicher was not present at the interview of Watson, and AUSA Suddath had not given him any details, only that there was a potential witness, so he had no details to relate to an ADA. (*Id.*) On cross-examination he clari-

fied that the extent of the conversation would have been that there was a witness, "he was supposedly there that day, and that he was willing to testify if need be. That's the level of detail I would have had." *Id.* at 29–30.

In contrast to the uncertainty of both AUSA Suddath and AUSA Eicher about whether they had spoken with ADA Sax before the Mattis trial, ADA Sax testified that he never spoke to an AUSA regarding Watson. (N.T., 7/12/91, at 56–57.) He stated that he learned about the possibility of Watson being a witness from "one or several Philadelphia police homicide detectives" but he could not remember who it was, specifically. (*Id.* at 51, 54–55.) ADA Sax stated that neither he, nor, to his knowledge, anyone else, had contact with anyone from the U.S. Attorney's office regarding the case. (*Id.* at 55.) ADA Sax also stated that he saw DEA–6 for the first time the day he testified at the post-sentence hearings. (*Id.* at 56.)

Although the testimony of ADA Sax conflicts with that of AUSA Eicher and may conflict with that of AUSA Suddath, Judge Savitt made a finding that all three had testified truthfully. (N.T., 7/23/91, at 41.) He also made the finding that there had been no *Brady* violation:

> I don't believe that there was a *Brady* violation here because the Commonwealth really didn't have this statement. The only information I can glean from this record is that they had evidence that [Watson] would be a witness and, one way or another, that evidence was given [to defense counsel] . . . .

(N.T., 7/23/91, at 56). Mattis has provided little evidence that these factual findings

___

ten documents as to Watson's statement in his possession, and failed to expressly mention the lack of oral statements allegedly made by one or more AUSAs to an ADA. However, both counsel and the trial judge extensively questioned the AUSAs as to any information they may have orally related to an ADA prior to Mattis's trial. Their testimony quickly showed that DEA–6 was not in existence,

even in handwritten form, before the trial, nor would the notes ever have been given to an ADA. Therefore the questions focussed on what may have been orally related, and it is clear that Judge Savitt's ruling from the bench on the *Brady* claim was based in large part on the testimony of the AUSAs as to what they orally related to the prosecution in Mattis's murder case.

are incorrect, pointing only to the statements early in AUSA Suddath's testimony that the information he related to an ADA was "generally" that contained in the DEA-6 and was "compatible" with that information. Mattis has ignored the more specific statements, such as AUSA Suddath's confirmation that he had related only the substance of paragraphs 25 and 26, not that of paragraph 27, the only one that contained the exculpatory and impeaching information, and his confirmation on cross that he had told the ADA that he had a witness to the Johnson murder who said that Mattis committed the murder. Mattis certainly has not overcome the presumption of correctness of the findings of the trial judge by clear and convincing evidence as required by 28 U.S.C. § 2254(e)(1).

We find that Mattis has failed to show that the adjudication of his *Brady* claim in the state courts "was based on an unreasonable determination of the facts in light of the evidence presented." § 2254(d)(2). Mattis has not demonstrated that a reasonable factfinder could not have reached the same conclusions given the evidence, so habeas relief is not warranted under this provision.[19] *See Campbell v. Vaughn,* 209 F.3d 280, 291 (3d Cir. 2000). In fact, the record shows that the prosecution was not in actual or constructive possession of any exculpatory or impeaching information that Watson may have provided to federal authorities. There is, therefore, no factual basis for a *Brady* claim, and we will deny the entire petition for a writ of habeas corpus on the merits.[20]

**19.** Habeas relief is not warranted under § 2254(d)(1), either. The *Brady* claim was decided in the state trial court on post-conviction motions solely on the basis that the prosecution was never in possession of *Brady* material. On direct appeal, the Superior Court affirmed on the same basis. *Commonwealth v. Mattis,* 423 Pa.Super. 636, 616 A.2d 717 (1992). On review under the Post Conviction Relief Act, the Pennsylvania courts denied review of the *Brady* claim on the ground that it had been raised on direct review. Except for the trial judge's implicit finding that the Watson statement, had it been given to the District Attorney's Office, comprised *Brady* material, and the implicit determination that any knowledge of Philadelphia police officer Allan Ventour regarding Watson's statement could not be imputed to the District Attorney's office—neither of which is disputed— there is no basis for an argument that the state court decision on the *Brady* claim "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**20.** Because Judge Savitt never applied the *Brady* standard, beyond that already discussed, we need not decide what the outcome would have been if he had found that the Commonwealth was in possession of the exculpatory and impeaching statements allegedly made by Watson. Judge Savitt did make some remarks about the outcome, but his statements were not made in the context of the *Brady* claim. Rather, his remarks on the possible prejudice to Petitioner were made in the context of an ineffectiveness claim based on counsel's failure to discover the statement, and in the context of the possibility of granting a new trial based on after-discovered evidence. (N.T., 7/23/91, at 56; *Commonwealth v. Mattis,* No.2008–2012, slip op. at 4, 6, 7 (Ct.Com.Pl., Phila.County, Sept. 17, 1991).) Judge Savitt stated that if the DEA-6 were available to him at the bench trial, the outcome would have been the same. *Mattis,* No.2008–2012, slip op. at 4. Judge Savitt's determination that the result of the bench trial would have been the same if he had heard the evidence does answer, in the negative, the question "whether the defendant would more likely than not have received a different verdict with the evidence," which has been held to be the incorrect standard. *Strickler,* 527 U.S. at 289, 119 S.Ct. 1936 (quoting *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555). Judge Savitt's statement also answers the correct standard: there is *not* "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and in the absence of the evidence the verdict was still "worthy of confidence," *Strickler,* 527 U.S. at 289, 119 S.Ct. 1936; *see also Kyles,* 514 U.S. at 434, 115 S.Ct. 1555; *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375.

Judge Savitt also stated that if Watson had testified consistently with the DEA-6, he still would have found Mattis guilty as an accomplice or a co-conspirator. *Mattis,* No.2008–2012, slip op. at 7. This statement is not

## V. Conclusion

We have found that there is no objection to the Magistrate Judge's Report and Recommendation with regard to Mattis's first, second, and third federal habeas corpus claims, and we approve and adopt his denial and dismissal of these claims. With regard to Mattis's fourth claim that *Brady* violations denied him a fair trial, we find and conclude that the learned Magistrate Judge was incorrect, and we also deny and dismiss this claim because it is procedurally defaulted and lacks merit even if it were not procedurally defaulted. In so doing we conclude and hold that Order No. 218, adopted by the Pennsylvania Supreme Court on May 9, 2000, is fully valid but that it was not intended to be retroactive. We note the great importance of this new rule and respectfully point out the need for immediate appellate review of the validity of this Order and whether or not it is retroactive.

relevant to a *Brady* determination because it looks at what would have happened if the testimony had been different, not what would have happened if the information in DEA–6, paragraph 27, had not been allegedly suppressed.

Because these remarks were not made in the context of the *Brady* claim and the *Brady* claim was decided solely on the basis that the Commonwealth never had the information in question, we need not decide whether his statement could have been construed as "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1).